STATE OF MINNESOTA

IN SUPREME COURT

A22-1376

Court of Appeals                                                Thissen, J.
                                        Concurring in part, dissenting in part,
                                                Anderson, J., Hudson, C.J.

Judith Rygwall, as Trustee for the Heirs and
Next of Kin of Amy Rygwall, deceased,

                        Appellant,

vs.                                                     Filed:  May 10, 2024
                                               Office of Appellate Courts
ACR Homes, Inc. d/b/a ACR Homes,

                        Respondent.

_____

Adam W. Hansen, Apollo Law LLC, Minneapolis, Minnesota, for appellant.

Stephen O. Plunkett, Gillian L. Gilbert, Bassford Remele, P.A., Minneapolis, Minnesota, for respondent.

Mark R. Bradford, Elizabeth A. Euller, Bradford Andresen Norrie & Camarotto, Bloomington, Minnesota, for amici curiae American Medical Association, Minnesota Medical Association, and Minnesota Hospital Association.

Taylor Brandt Cunningham, Conlin Law Firm, LLC, Minneapolis, Minnesota, for amicus curiae Minnesota Association for Justice.

Julia J. Nierengarten, Louise A. Behrendt, Meagher & Geer P.L.L.P., Minneapolis, Minnesota, for amicus curiae Minnesota Defense Lawyers Association.

_____

1

1.      Minnesota Statutes section 145.682 (2022) did not modify the common-law standard for causation in medical malpractice cases to require plaintiffs to satisfy a more stringent burden of proof to establish causation than is required in other negligence cases.

2.      A genuine issue of material fact over whether a health care provider caused injury to the decedent in a medical malpractice claim precluded summary judgment.

Reversed and remanded.

O P I N I O N

THISSEN, Justice.

Amy Rygwall ("Amy")[1] was a profoundly vulnerable woman in the care of respondent ACR Homes, Inc. ("ACR").  Amy was non-verbal and used a wheelchair.  She also experienced daily seizures.  On New Year's Eve, 2015, Amy aspirated (inhaled food into her lungs) and began showing signs of respiratory distress including coughing, foaming saliva from her mouth, raspy breathing, change in skin coloration, and weakness.

A member of ACR's staff was informed of these signs and was concerned that Amy had aspirated.  She did not seek immediate emergency care for Amy.  Rather, she searched online for an urgent care clinic that accepted Amy's insurance with the shortest wait time.  She drove Amy from Anoka to St. Paul, stopping once along the way.  At urgent care, Amy's condition was severe enough that she was immediately taken for evaluation,

---

[1]      To avoid confusion between Amy Rygwall and her mother, Judith Rygwall, who filed this action as trustee for Amy's heirs and next of kin, we refer to Amy by her first name.

jumping ahead of other patients waiting for care. While waiting for a physician, Amy showed additional signs of respiratory distress and was taken to the hospital. She was immediately given antibiotics to treat potential aspiration pneumonia—as well as other treatment for her respiratory distress—but her condition continued to deteriorate. By this point, more than 3 hours had passed since ACR was notified of Amy's condition. She died 13 days later from related complications.

Amy's mother, appellant Judith Rygwall ("Rygwall"), filed this wrongful-death action, asserting that ACR should have immediately called 911 upon learning of Amy's respiratory distress and that failure to do so caused Amy's death. After the close of discovery, ACR moved for summary judgment on the issue of causation. The district court granted ACR's motion and the court of appeals affirmed. The questions before this court are whether the burden of proof to establish causation in medical malpractice cases is different than that required in other negligence cases and whether the district court erred in granting summary judgment to ACR.

**FACTS**

This case comes to us on appeal from the district court's decision to grant summary judgment to ACR. Accordingly, we set forth the facts and inferences in the light most favorable to Rygwall. *See Henson v. Uptown Drink, LLC*, 922 N.W.2d 185, 189–90 (Minn. 2019) (describing the summary judgment standard).

Amy was born in 1972 with profound intellectual and physical disabilities. Amy experienced seizures that typically occurred once or twice a day, lasting between 5 and

90 seconds each. She used a wheelchair. Although non-verbal, Amy learned to communicate some of her needs with basic sign language.

Amy lived with her parents until 2010, when she moved to a group home owned and operated by ACR. At ACR, she was completely dependent on her caretakers for all health care and communication needs and was accompanied by staff at all times. While living at ACR, Amy also spent time at Rise, Inc. ("Rise"), a day program for disabled adults in Anoka.

Amy's care plan explained that Amy was able to eat semi-independently but required a modified diet and supervision while eating to reduce the risk of choking. Because of her cognitive disability, Amy was unable to regulate the amount of food placed in her mouth and did not chew food properly. The care plan required ACR staff to check if Amy had food lodged in her cheeks or throat in case she had not swallowed completely. The care plan also explained that, in the past, Amy had occasionally choked on food due to seizures while eating.

On December 31, 2015, Amy went to her day program at Rise. The notes ACR left with Rise suggested that Amy had a relaxed evening at the group home the night before. Nothing was reported in the seizure notes upon Amy's arrival at Rise. In fact, the evening before, December 30, Amy suffered a seizure at the group home. She suffered a second seizure early in the morning of December 31.

Around noon on December 31, Amy was finishing lunch at Rise. After taking a bite of pudding, Amy coughed and her eyes began to water. The Rise direct-care worker attending to Amy, M.C., had been facing away from Amy for a few moments while she

was assisting other residents; Amy's coughing got her attention. When M.C. reached her, she saw foaming saliva coming from Amy's mouth. M.C. checked if Amy had any food in her mouth but did not see anything. M.C. also observed Amy making a "raspy sound" as she breathed, which made M.C. concerned. M.C. asked someone to get the Rise nurse.

The Rise nurse came to see Amy and documented her observations as follows:

[I] went into the kitchen and saw Amy sitting in her wheelchair with some tears running down her face. She had some white foam in her mouth. No visible food or food particles were noted in the foam. I asked Amy to say "ball" which she did, but with some difficulty. [I] looked in her mouth to check for food and no food or food particles were visible at this time either. She listened to her lung sounds which were rattling some and 16 beats [sic] per minute. However, Amy's base line lung sounds are raspy. Her skin was pale to flush.

Rygwall challenges the claim that Amy's lung sounds were normally raspy; according to Amy's physical on November 23, 2015, her normal, baseline lung sounds were "clear" without "rales or wheezes." Because we are reviewing a grant of summary judgment, we assume that the rattling sounds in Amy's lungs were unusual. M.C. later helped Amy to the bathroom and observed that Amy seemed tired and very weak. Amy was more pale than usual. M.C. was so anxious about Amy's condition that she made sure the nurse stayed with Amy.

At 12:35 p.m., Rise called A.J., ACR's residential coordinator, to notify her of Amy's condition. The Rise staff member told A.J. that Amy had just eaten lunch and was now foaming at the mouth and having difficulty breathing, Amy's breaths sounded raspy, she was pale, and she had tears running down her face. A.J. told the Rise staff member that someone from ACR would come pick up Amy.

5

After the call, A.J. spoke with the ACR nurse and the two discussed Amy's symptoms and how to address them. A.J. was concerned that Amy may have had a seizure during lunch, causing Amy to aspirate. A.J. and the ACR nurse both knew that foaming at the mouth, pale complexion, difficulty breathing, and rattly breathing were signs of respiratory distress. ACR's protocol states that if a resident is in respiratory distress, 911 should be called. And the ACR nurse agreed that some of Amy's symptoms indicated respiratory distress. Rather than calling 911, they decided that A.J. would pick up Amy at Rise and take her to an urgent care clinic.

A.J. does not recall where she was when she received the phone call from Rise. During the day, the group home was unstaffed but A.J. sometimes worked on her computer there. Other times she worked during the day at ACR headquarters in Roseville or from a coffee shop. Before leaving to pick up Amy, A.J. spent several minutes at her computer searching for an urgent care facility that was in-network and would accept Amy's health insurance. Although there were in-network urgent care locations closer to Rise, A.J. ultimately chose an urgent care facility located in St. Paul—which is about 24 miles from the Rise facility in Anoka—because the St. Paul location had the shortest wait time.

In the meantime, the Rise nurse continued to monitor Amy. Although she observed that Amy was "not in any visible distress," she also noted that Amy "was not acting like her normal self" and continued to have "some white foamy saliva at times," "watery eyes," and "pale to flush" skin tone. Amy's foaming at the mouth was so severe that M.C., the Rise direct-care worker, changed Amy's shirt, which had become too damp to wear. Amy took a nap while waiting for the ACR staff to arrive.

6

A.J. did not arrive at Rise until 1:41 p.m., over an hour after she received the phone call describing Amy's medical condition. When A.J. arrived at Rise, she spoke briefly with the Rise nurse. In A.J.'s assessment, Amy "looked like normal" and had gone "back to baseline."

While driving to the St. Paul urgent care, A.J. passed a different HealthPartners clinic she had not seen online. She decided to deviate from the plan to drive to St. Paul and stopped at the clinic to see if Amy could be seen. A.J. unloaded Amy and her wheelchair from the van and brought Amy into the clinic. When she learned that urgent care was not open, A.J. took Amy back to the van and left. A.J. did not explain Amy's condition to the staff at the clinic (which was otherwise open) or ask if they could see Amy on an urgent basis.

In a statement A.J. made to the Minnesota Department of Health a few months after the incident, A.J. said that Amy's breath was rattling on the drive to the urgent care clinic. In later deposition testimony, A.J. said that during the drive to urgent care, she checked on Amy by looking at her through the rearview mirror. She never assessed Amy's respiration. According to A.J., Amy appeared to be "her normal self" and her condition did not change during the drive. It was only when she was wheeling Amy into the St. Paul urgent care clinic that A.J. first noticed Amy's breath seemed a little rattled. Based on the procedural posture of this case, we assume that Amy's breath was rattling on the drive to the urgent care clinic.

A.J. arrived at the clinic around 2:49 p.m. She did not bring up the details of Amy's condition to the receptionist or other staff at the clinic. The waitlist at the St. Paul clinic

was over an hour long when A.J. and Amy arrived. Nonetheless, clinic staff took Amy to an exam room within 5 minutes of arrival. According to A.J., Amy was "pale as [her] breathing worsened."

The first medical notes at the St. Paul clinic were recorded at 2:58 p.m. A nurse took Amy's vital signs. Many were normal, but her respiration rate was elevated. Further, at 3:05 p.m., her oxygen saturation level was at 94 percent. A.J. did not tell the nurse that she feared Amy had aspirated and the nurse did not listen to Amy's lungs. The clinic notes list Amy's diagnosis as "congestion (foaming at the mouth)." The clinic nurse then left the exam room, and the plan was for a physician to come examine Amy.

While waiting to be evaluated further, Amy's lips began turning blue. A.J. pressed the call button for a nurse to come to the room. A different nurse arrived and observed that Amy was "foaming at the mouth" and "appear[ed]" to be in "mild distress." When the nurse listened to Amy's lung sounds, she heard gurgling noises, a sign of fluid buildup. The nurse found Amy had low oxygen saturation. It was not until the second nurse arrived that A.J. told anyone at the urgent care clinic that Amy had possibly aspirated while eating lunch hours earlier.

The nurse called 911 around 3:30.[2] The ambulance arrived 6 minutes later and paramedics immediately assessed Amy. They found Amy to have shallow, rapid breathing,

---

[2]     The dissent makes an assumption about the medical records from the St. Paul clinic: it relies on a timestamp for when a medical record was created—3:30 p.m.—and assumes that was the time when everything recorded in the note occurred. But the note is a summary of activity that happened sometime before 3:30. The dissent asserts that Amy's lips turned blue at 3:30 to make the point that Amy's condition changed radically—essentially into a different condition—between 3:00 when Amy arrived and 3:30 when 911 was called. The

and wet-sounding lungs. A.J. told the paramedics she thought Amy had aspirated earlier that day. The paramedics moved Amy to the ambulance and drove to Regions Hospital in St. Paul. They arrived at 3:53 p.m.

When she arrived at the hospital emergency department, Amy was in "obvious respiratory distress" with low oxygen saturation, "audible gurgling," and "wet" sounding lungs. Emergency department physicians determined Amy to be "critically ill." The doctors immediately started Amy on intravenous antibiotics to respond to potential aspiration pneumonia and intubated her. A note entered into the Regions Hospital System at 10:31 p.m. by the attending doctor summarized the day's events. It opined that Amy possibly had sepsis. She was diagnosed with acute respiratory distress syndrome and florid sepsis at 4:48 p.m. the next day.

Amy's condition continued to worsen for almost 2 weeks. She passed away on January 13. The hospital listed her cause of death as "ARDS"—short for "acute respiratory

---

record does not definitively support that timeline and, based on the procedural posture of this case on summary judgment, it certainly does not support the implied conclusion that the underlying nature of Amy's condition (as opposed to its manifest symptoms) changed substantially after Amy arrived at the St. Paul clinic.

Similarly, the notes from HealthPartners show that the nurse at the St. Paul clinic heard expiratory rhonchi (gurgling sounds) throughout Amy's lungs that suggested fluid in the lungs. We do not know precisely when the second evaluation—at which point the nurse listened to Amy's lungs—occurred. Importantly, the record does not tell us what Amy's lungs sounded like when she arrived at the St. Paul clinic to suggest that her lungs then did not have fluid in them. A.J. did not provide complete information to the staff at the clinic and the records do not reflect that anyone listened to her lungs during the initial evaluation. And as noted above, A.J. herself noted rasping lung sounds when she arrived at the clinic and during the drive to the clinic. As we discuss more fully in our analysis, resolving factual disputes over timelines is something squarely in the knowledge and experience of layperson jurors.

9

distress syndrome"—with underlying causes of acute kidney injury, septic shock, and aspiration pneumonia.

Rygwall filed this wrongful-death action, alleging that the negligence of ACR's staff caused Amy's death. Her theory was that ACR had a duty to immediately call 911 when Amy exhibited signs of respiratory distress and aspiration, including coughing, tears on her face, foamy saliva sufficient to dampen her shirt enough to require a change, raspy breathing, weakness, and pale skin. According to Rygwall, failure to get immediate antibiotic treatment for Amy's possible aspiration resulted in her ultimate death.

The litigation proceeded with discovery. In accordance with Minn. Stat. § 145.682, subds. 2, 4 (2022), Rygwall provided two expert affidavits to support her claim.[3] ACR did not move to dismiss Rygwall's claim under Minn. Stat. § 145.682, subd. 6(c) (2022), which provides a special statutory dismissal mechanism for medical malpractice claims lacking sufficient support from expert affidavits, including a chance for the plaintiff to cure any asserted deficiencies.[4] Instead, ACR moved for summary judgment, arguing that Rygwall

---

[3]    Section 145.682, subdivision 2, establishes requirements "[i]n an action alleging malpractice, error, mistake, or failure to cure . . . against a health care provider" in which "expert testimony is necessary to establish a prima facie case." Namely, the plaintiff must: (1) "serve upon defendant with the summons and complaint an affidavit as provided in subdivision 3; and (2) serve upon defendant within 180 days after commencement of discovery under the Rules of Civil Procedure, rule 26.04(a) an affidavit as provided by subdivision 4."

Section 145.682, subdivision 4, requires an affidavit that "state[s] the identity of each person whom plaintiff expects to call as an expert witness . . . with respect to the issues of malpractice or causation, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion."

[4]    Section 145.682, subdivision 6(c) provides:

did not have sufficient evidence to show that ACR's failure to seek immediate emergency treatment caused Amy's death. Among other things, ACR focused its summary judgment motion on the affidavits provided by Rygwall's experts.

Rygwall's two primary experts were Dr. William Lybarger and Dr. Jacob Keeperman. Dr. Lybarger is a psychologist with extensive experience managing health and human service organizations. His affidavit discussed the standard of care.[5] Because he is not a medical doctor, Rygwall does not claim that he is qualified to testify on the issue central to the summary judgment motion: whether earlier treatment might have prevented Amy's aspiration from worsening and ultimately resulting in her death. *See* Minn. R. Evid. 702; *Gross v. Victoria Station Farms, Inc.*, 578 N.W.2d 757, 761 (Minn. 1998) ("The competency of an expert witness to provide a medical opinion depends upon both the degree of the witness's scientific knowledge and the extent of the witness's practical

---

Failure to comply with subdivision 4 because of deficiencies in the affidavit or answers to interrogatories results, upon motion, in mandatory dismissal with prejudice of each action as to which expert testimony is necessary to establish a prima facie case, provided that:
(1) the motion to dismiss the action identifies the claimed deficiencies in the affidavit or answers to interrogatories;
(2) the time for hearing the motion is at least 45 days from the date of service of the motion; and
(3) before the hearing on the motion, the plaintiff does not serve upon the defendant an amended affidavit or answers to interrogatories that correct the claimed deficiencies.

Minn. Stat. § 145.682, subd. 6(c) (2022).

[5] At this stage of the proceedings, ACR does not contest that the standard of care required it to seek immediate emergency care for Amy or that ACR violated that standard of care. Of course, ACR may at a later date challenge Rygwall's position on the standard of care and its breach.

experience with the subject of the offered opinion."); Minn. Stat. § 147.081, subd. 3(3) (2022).

Dr. Keeperman is a Minnesota physician certified in emergency medicine, emergency medical services, and critical care medicine. Dr. Keeperman submitted a 10-page affidavit discussing the standard of care, why he thinks ACR violated it, and causation.[6] In the affidavit, Dr. Keeperman identified steps that a reasonable health care provider like ACR would have taken when faced with a situation where a fully dependent and disabled client—who has a history of seizures and proclivity for choking—exhibited several signs of respiratory distress and potential aspiration. First, Dr. Keeperman opined that a reasonable health care provider exercising due care would have taken immediate steps to ensure that Amy was taken to a facility for emergency medical care. He also opined that a reasonable health care provider exercising due care would have given all relevant medical providers complete information about Amy's condition and the aspiration incident at Rise.

Dr. Keeperman's affidavit also summarized his position on causation as follows:

> My opinion [formed to a reasonable degree of medical certainty] is that the delay in obtaining emergency care for Amy Rygwall and failure to provide all relevant medical information to other decision-makers and medical

---

[6]     ACR does not dispute at this time that Amy aspirated (breathed food or fluid into her lungs) while eating lunch and that, as a result, she developed aspiration pneumonia, septic shock, acute respiratory distress syndrome ("ARDS") and the acute kidney injury that caused her death. Indeed, the medical records, which were reviewed and referenced by Dr. Keeperman, suggest that was the course of Amy's deterioration. Rather, ACR's argument for summary judgment is that the record is devoid of evidence that Amy's aspiration while eating lunch would not have resulted in aspiration pneumonia, septic shock, ARDS, acute kidney injury and death *even if* ACR had taken Amy for emergency treatment immediately upon learning Amy's symptoms of respiratory distress at Rise.

12

personnel caused or contributed to her rapid clinical deterioration and subsequent ARDS, septic shock, multi-system organ failure, and death.

. . . .

Had Amy Rygwall's change in clinical status been immediately acted on with rapid evaluation and treatment, there is a reasonable degree of medical certainty her condition never would have deteriorated to ARDS, septic shock, multi-system organ failure, and ultimately her death.

Dr. Keeperman explained that in forming these opinions, he reviewed the extensive medical and other records and he discussed relevant facts from the record in his affidavit. He observed that ACR's records and procedures stated that—because Amy was non-verbal and completely dependent on staff for all her health needs—she must be accompanied by staff at all times and that Amy relied on ACR to articulate her medical status to other care providers. ACR's records and protocols also made clear that Amy had a modified diet due to choking concerns. Finally, Dr. Keeperman observed that ACR's records and protocols paid particular attention to Amy's seizure disorder, which resulted in frequent seizures and required that ACR personnel call 911 for any abnormal respiratory distress during a seizure.

In his affidavit, Dr. Keeperman further pointed to the records in this case and observed that Amy had a seizure in the later afternoon of December 30 (the day before the incident) and another seizure early in the morning of December 31, before she went to Rise. ACR never reported those seizures to Rise on December 31—a fact corroborated by M.C., the direct-care person attending to Amy at Rise.

Dr. Keeperman further opined, based on specific records, that Amy's aspiration was the result of a seizure during lunch and that ACR staff, including A.J., should have

13

recognized her condition as aspiration following a seizure. He based his conclusion on Amy's risk of choking and history of seizures[7] and on the fact that Amy was exhibiting many symptoms of aspiration: white frothy saliva, raspy breathing, pale to flush skin, watering eyes, coughing, and unusual behavior. As discussed earlier, these symptoms were also confirmed by subsequent depositions of Rise workers. Dr. Keeperman also relied upon deposition testimony from A.J. and medical records indicating that A.J. reported that Amy's respiratory distress was the result of an aspiration event.

Dr. Keeperman also criticized ACR staff for failing to provide complete information to Rise about Amy's seizures on December 30 and 31. Dr. Keeperman similarly criticized A.J. for failing to inform the health care providers at the clinic they briefly stopped at that Amy had aspirated and needed urgent care even if it was outside of usual urgent care hours.

As to rapid evaluation and treatment, Dr. Keeperman, a certified emergency medicine and critical care doctor, opined that early and aggressive intervention in the treatment of sepsis, septic shock, and ARDS decreases morbidity and mortality. Moreover, Dr. Keeperman expressly referred to records from Regions Hospital showing that Amy was given antibiotics for "presumed aspiration pneumonia" almost immediately upon arrival at the emergency department even though there was no sign at that time that the providers at Regions Hospital had determined that Amy had sepsis. And he cited reports that state that

---

[7] M.C., the direct-care person at Rise, testified that she was helping other individuals and not looking at Amy when she choked and started coughing. M.C. also stated in her deposition that she was looking away long enough for Amy to have had a seizure.

it is routine hospital practice to rapidly administer antibiotics to patients with symptoms of sepsis.

A report upon which Dr. Keeperman relied also showed that the longer it takes to administer antibiotics to a patient with sepsis—in fact, for each hour of delay—the more likely it is that the patient will become more ill and die.[8] Dr. Keeperman relied on this evidence to explain the mechanism whereby the early administration of antibiotics interrupts the progression from aspiration and aspiration pneumonia to sepsis, ARDS, organ failure, and death.

Eventually, ACR filed a motion for summary judgment, arguing that Rygwall did not establish causation. The district court granted the motion because "Dr. Keeperman does not opine what specific course of action or treatment was needed nor any sort of timeline by when administering that treatment would have prevented Amy's death." The court of appeals affirmed, reasoning that Dr. Keeperman's report "does not explain how Amy's treatment would have progressed had she been seen sooner or how immediate treatment would have prevented her condition from becoming fatal." *Rygwall as Tr. for Rygwall v. ACR Homes, Inc.*, No. A22-1376, 2023 WL 3701358, at *5 (Minn. App. May 30, 2023). We granted review.

**ANALYSIS**

This case comes to us from the district court's order granting summary judgment to ACR. This procedural posture is important for three reasons. First, our review is de novo.

_____

[8]     The conclusions in the reports upon which Dr. Keeperman relies are qualified and focus largely upon the administration of antibiotics to patients suspected of having sepsis.

*Staub as Tr. of Weeks v. Myrtle Lake Resort, LLC*, 964 N.W.2d 613, 620 (Minn. 2021).
Second, summary judgment is only proper if no genuine issue of material fact exists.
*Citizens State Bank Norwood Young Am. v. Brown*, 849 N.W.2d 55, 61 (Minn. 2014). A
genuine issue of material fact exists when reasonable minds can draw different conclusions
from the evidence presented. *328 Barry Ave., LLC v. Nolan Props. Grp., LLC*, 871 N.W.2d
745, 751 (Minn. 2015). We review all the evidence in the record as a whole to determine
if there is an issue of material fact. *J.E.B. v. Danks*, 785 N.W.2d 741, 751 (Minn. 2010).
Third, we "vie[w] the evidence in the light most favorable to the nonmoving party and
resolv[e] all doubts and factual inferences against the moving party." *Staub*, 964 N.W.2d
at 620.

I.

ACR's first argument is that medical malpractice claims—referring broadly to
claims that require testimony from a medical expert and that are brought against health care
providers, nursing homes, and the like—are a special type of claim that require plaintiffs
to satisfy a more stringent burden of proof to establish causation than is required in other
negligence cases.[9] Specifically, ACR argues that Minn. Stat. § 145.682 (2022), which was

---

[9] Both parties accept that ACR is a "health care provider" under Minn. Stat.
§ 145.682. Section 145.682, subdivision 2, applies to actions "alleging malpractice, error,
mistake, or failure to cure, whether based on contract or tort, against a health care provider
which includes a cause of action as to which expert testimony is necessary to establish a
prima facie case." Minn. Stat. § 145.682, subd. 1 (2022) defines "health care provider" by
referencing Minn. Stat. § 145.61, subd. 4 (2022). Under that provision, "health care
provider" includes persons or entities providing services "furnished by a hospital,
sanitarium, nursing home or other institution for the hospitalization or care of human
beings." Minn. Stat. § 145.61, subd. 4 (defining "health care").

16

enacted in 1986, fundamentally changed the common-law tort of the negligent practice of medicine. Section 145.682 requires a plaintiff in a medical malpractice case to serve at least two expert-related affidavits, one with the summons and complaint, and the other within 180 days after discovery commences. Minn. Stat. § 145.682, subd. 2. The statute further provides a procedure allowing defendants to seek dismissal of a medical malpractice claim because one of the affidavits is insufficient. *Id.*, subd. 6. ACR points to court of appeals precedents requiring a "detailed chain of causation," *see Maudsley v. Pederson*, 676 N.W.2d 8, 14 (Minn. App. 2004), as evidence of the purported change in law following section 145.682's enactment.

A.

Before we reach this argument, however, we must address a preliminary issue. Rygwall argues that ACR cannot rely on section 145.682 because it forfeited any reliance on the statute by not raising it below. We conclude, however, that ACR forfeited neither its causation argument nor its right to rely on cases citing section 145.682 in making that argument.

It is true that ACR did not move to dismiss Rygwall's claim under section 145.682, subdivision 6. Section 145.682 requires a plaintiff in a medical malpractice case to serve at least two affidavits on the defendant: one affidavit of expert review that must be served along with the summons and complaint, Minn. Stat. § 145.682, subds. 2(1), 3, and one affidavit of expert identification that must be served within 180 days after commencement of discovery (the "Subdivision 4 Affidavit(s)"). Minn. Stat. § 145.682, subds. 2(2), 4. Under subdivision 6, a defendant health care provider may move to dismiss a claim if the

17

Subdivision 4 Affidavit is "deficient." Minn. Stat. § 145.682, subd. 6. A Subdivision 4 Affidavit is deficient if it fails to state the "identity of each person that the plaintiff expects to call as an expert witness at trial with respect to the issues of malpractice or causation, the substance of the facts and circumstances to which the expert is expected to testify, and a summary of the grounds for each opinion." Minn. Stat. § 145.682, subd. 4(a).

To dismiss a claim due to a deficient Subdivision 4 Affidavit, the defendant must "identify the claimed deficiencies in the affidavit" and set the time for hearing on the motion at least 45 days from the date of service of the motion. The plaintiff can avoid dismissal by serving an amended affidavit or interrogatory answers before the hearing that correct the claimed deficiencies. Minn. Stat. § 145.682, subd. 6(c).

This process differs from summary judgment because it is limited to examining the four corners of the expert affidavit instead of the record as a whole. In addition, a motion to dismiss under section 145.682, subdivision 6, provides the plaintiff with notice of alleged deficiencies and a chance to remedy them. That is not necessarily true in the context of a summary judgment motion. The Legislature made a choice in section 145.682, as amended in 2002, to enact procedural protections for *both* the plaintiff and the defendant in a medical malpractice action, *see Wesley v. Flor*, 806 N.W.2d 36, 40 (Minn. 2011). Those procedural protections are not realized, however, when the defendant chooses to seek summary judgment based on the alleged failure of the plaintiff's expert instead of moving to dismiss under section 145.682, subdivision 6.

In this case, ACR did not move to dismiss under section 145.682, subdivision 6(c), and served its summary judgment motion only 28 days before the hearing—sufficient for

18

a summary judgment motion, but less than the 45 days required for dismissal under the statute. Thus, if ACR were seeking to invoke certain *procedural* limitations associated with a motion to dismiss under section 145.682, subdivision 6, it would have forfeited those arguments.

But we understand ACR to be making a different argument. ACR asserts that the *substantive* standard for causation in malpractice cases is higher than in other negligence cases because of section 145.682, subdivision 4(a), and precedents interpreting that provision. Although the courts below never explicitly mentioned the statute—and ACR cited it for the first time before this court—the district court, court of appeals, and the parties discussed and relied on our cases, and those of the court of appeals, applying the statute in assessing ACR's causation argument. We conclude that arguments about the scope of the burden for proving causation in medical malpractice cases—which were fully briefed by the parties before our court—were not forfeited. Further, our job is to get the law correct and to consider arguments (in the absence of prejudice to one of the parties) regarding the proper legal standard even if they were not precisely raised by the parties in the district court or court of appeals. *See State v. Hannuksela*, 452 N.W.2d 668, 673 n.7 (Minn. 1990) (observing that "it is the responsibility of appellate courts to decide cases in accordance with law" even if the parties fail to raise an argument).

B.

We now turn to ACR's substantive legal arguments that the causation standard in medical malpractice actions is more stringent and difficult to satisfy than the causation standard in other cases of negligence or malpractice.

19

1.

Medical malpractice is a common-law tort that has long been recognized in Minnesota. *See Bennison v. Walbank*, 37 N.W. 447, 447 (Minn. 1888). It is a species of common-law negligence. *See Tousignant v. St. Louis County*, 615 N.W.2d 53, 56 n.1 (Minn. 2000) (noting that a medical malpractice claim is simply a claim "against health care providers for failing to exercise that standard of care required of them in care and treatment"); *Plutshack v. Univ. of Minn. Hosps.*, 316 N.W.2d 1, 5 (Minn. 1982) (characterizing a medical malpractice claim as a doctor's "negligent care and treatment" of a patient). The primary difference between a claim of medical malpractice and one of ordinary negligence is that health care professionals are judged against the care with which a reasonable health care professional would act rather than the care with which a reasonable ordinary person would act. *Compare Fabio v. Bellomo*, 504 N.W.2d 758, 762 (Minn. 1993) (medical malpractice), *with Domagala v. Rolland*, 805 N.W.2d 14, 28 (Minn. 2011) (ordinary negligence).

Common-law principles as to causation, however, are largely the same as between medical malpractice claims and claims of ordinary negligence. For medical malpractice claims, we have generally held—both before and after the 1986 passage of section 145.682—that proving causation required that a plaintiff must show that it is "more likely than not that the defendant's conduct was a substantial factor in bringing about the result." *Walton v. Jones*, 286 N.W.2d 710, 715 (Minn. 1979) (quoting *Walstad v. Univ. of Minn. Hosps.*, 442 F.2d 634 (8th Cir. 1971)). That remains the causation standard today. *Dickhoff ex rel. Dickhoff v. Green*, 836 N.W.2d 321, 337 (Minn. 2013). We have likewise

20

been clear that a plaintiff in a common-law negligence claim must show that the defendant's negligent act was a foreseeable, substantial factor in bringing about the injury. This standard requires a plaintiff to convince the jury that the harm would not have occurred without the negligent act. *George v. Est. of Baker*, 724 N.W.2d 1, 11 (Minn. 2006) (stating that "[t]he classic test for determining factual cause is to compare what actually happened with a hypothetical situation identical to what actually happened but without the negligent act"). The same is true for medical malpractice claims. *Walton*, 286 N.W.2d at 715.

Further, in common-law negligence cases, we have stated that the question of whether a defendant's negligence is a cause of the plaintiff's injuries is generally an issue of fact for the jury to decide; it is for the jury, not the court, to draw inferences about causation. *Staub*, 964 N.W.2d at 621. As long as the jury can reasonably infer from the evidence, without speculation, that the defendant caused the plaintiff's injury (including death), summary judgment is not appropriate. These principles apply with equal force in medical malpractice cases as they do in ordinary negligence cases. *See Harju v. Allen*, 177 N.W. 1015, 1016 (Minn. 1920) (stating in a medical malpractice case that the question of whether a doctor exercised reasonable skill and care "is usually a question of fact").

Of course, a finding of causation cannot be based upon mere speculation or conjecture. *Staub*, 964 N.W.2d at 621. Accordingly, a jury may not draw inferences about cause when the relationship between the negligent act and the harm to the plaintiff is not within "the common knowledge of laymen." *Walton*, 286 N.W.2d at 715. "Where a question involves obscure and abstruse medical factors such that the ordinary layman

21

cannot reasonably possess well-founded knowledge of the matter and could only indulge in speculation in making a finding, there must be expert testimony . . . ." *Bernloehr v. Cent. Livestock Ord. Buying Co.*, 208 N.W.2d 753, 755 (Minn. 1973). We have also said, however, that "inferences, if rational and natural, which follow from a sequence of proved events may be sufficient to establish causal connection without any supporting medical testimony." *Pagett v. N. Elec. Supply Co.*, 167 N.W.2d 58, 64 (Minn. 1969). These principles are not unique to medical malpractice claims. They are true of all negligence cases where expert testimony is required. *See Atwater Creamery Co. v. W. Nat'l Mut. Ins. Co.*, 366 N.W.2d 271, 279 (Minn. 1985).

2.

With that background in mind, we turn to ACR's argument that the enactment of section 145.682 fundamentally altered these principles that govern common-law medical malpractice claims. The statute provides that the Subdivision 4 Affidavit(s) must identify the experts expected to testify with respect to "the issues of malpractice or causation," including the substance of their facts and opinions and the grounds for their opinions. There is no indication that the Legislature intended, by this language, to effectuate a sea change in the causation requirement. We "presume that statutes are consistent with the common law unless there is express wording or necessary implication of the intent to abrogate the common law." *Dahlin v. Kroening*, 796 N.W.2d 503, 505 (Minn. 2011); *see also Matter of Tr. of Robert W. Moreland*, 993 N.W.2d 80, 89 (Minn. 2023). The elements of "malpractice" and "causation" are not expressly modified by the statute. Nor did the statute repeal the common law by necessary implication.

22

Rather than abrogating the common law, the statute instead incorporates it by reference. Section 145.682 requires an affidavit that lists "each person whom plaintiff expects to call as an expert witness at trial to testify with respect to the issues of malpractice or causation, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion." Minn. Stat. § 145.682, subd. 4. Malpractice is a common-law tort (which the statute nowhere modifies) and causation is a basic element of negligence. In other words, the statute is purely procedural; it mentions common-law concepts but nowhere purports to modify them.

Our cases interpreting section 145.682 have explained the requirements for plaintiffs in medical malpractice cases in greater detail. We have held that the expert affidavit must:

> (1) disclose specific details concerning the expert's expected testimony, including the applicable standard of care, (2) identify the acts or omissions that the plaintiff alleges violated the standard of care, and (3) include an outline of the chain of causation between the violation of the standard of care and the plaintiff's damages.

*Teffeteller v. Univ. of Minn.*, 645 N.W.2d 420, 428 (Minn. 2002) (relying on *Sorenson v. St. Paul Ramsey Med. Ctr.*, 457 N.W.2d 188, 193 (Minn. 1990)). These requirements do not modify the common-law causation standard any more than the statutory text did. They merely require that the expert affidavit—to the extent expert testimony is needed to prevent the jury from speculating—include information about the hornbook elements of negligence described above: duty (standard of care), breach (violation), causation, and injury. *Anderson v. State, Dep't of Nat. Res.*, 693 N.W.2d 181, 186 n.1 (Minn. 2005).

23

To support its argument that a person injured by a medical professional bears a higher burden of proof than other injured individuals, ACR places great emphasis on precedents from the court of appeals following section 145.682's enactment that require plaintiffs to show a "detailed chain of causation." *See Maudsley*, 676 N.W.2d at 14. The implication is that the court of appeals' use of this phrase signifies a major break from the common-law principles that controlled before section 145.682's enactment. ACR claims that a medical malpractice plaintiff must now provide significantly more, and more thorough, detail to establish causation than must a plaintiff in an ordinary negligence action.

We disagree. ACR reads too much into this phrase. In *Sorenson*, and several other medical malpractice cases following it, we consistently stated that a plaintiff must provide "an *outline* of the chain of causation." *Sorenson*, 457 N.W.2d at 193 (emphasis added); *Stroud v. Hennepin Cnty. Med. Ctr.*, 556 N.W.2d 552, 556 (Minn. 1996) (same). Since those cases, the principle we announced in *Sorenson* morphed, through a jurisprudential game of "telephone" among the appellate courts into a requirement that plaintiffs provide a "*detailed* chain of causation," *see Zahn-Amsler v. Minn. Thoracic Assocs., P.A.*, No. C3-00-224, 2000 WL 1015844, at *3 (Minn. App. July 25, 2000) (emphasis added), and an implicit understanding that a detailed chain of causation requires plaintiffs in medical malpractice claims to provide a greater degree of proof than is necessary in other negligence cases—that people injured by medical professionals must meet a kind of more-probable-than-not-plus level of proof.

We assume responsibility for this confusion. Over the years, we have used varying terms and phrases to describe the level of detail required for expert opinions on the standard of care and causation in Subdivision 4 Affidavits. Those variations have sown confusion among practitioners and judges. We now clarify what is expected in a non-deficient affidavit in medical malpractice cases.

In our first case interpreting section 145.682, *Sorenson*, we established several important principles. First, reading section 145.682 against the background of our preference "to dispose of cases on the merits," we observed that procedural dismissal under section 145.682, subdivision 6, was meant to eliminate frivolous cases—i.e., those cases "completely unsupported by expert testimony" in circumstances where expert testimony is needed. *Sorenson*, 457 N.W.2d at 192, 191.

Second, in *Sorenson* we expressly rejected the argument that section 145.682 (and similar expert-disclosure language in the Minnesota Rules of Civil Procedure) require a "detailed disclosure." *Id.* at 191. We noted that the statute's (and the rule's) requirements to state "the *substance* of facts and opinions" and provide "a *summary* of the grounds for each opinion" suggest a detailed disclosure is unnecessary. *Id.* (emphases added).

Finally, we determined that the expert's affidavit did not satisfy that test because it contained "empty conclusions" regarding necessary elements for the plaintiff's claim. *Id.* at 193. The expert only stated that the defendant health care providers "failed to properly evaluate[,] . . . care and treat" the harmed patient; but the expert did not connect the specific conduct of the defendants to a breach of the proper standard of care or the injury to the harmed patient. *Id.* at 192–93. Our major objection in *Sorenson* was that the affidavit

25

referred broadly to "medical history and records" without identifying any facts in those records. *Id.* It is that form of expert opinion—broad general statements without any reference to the facts of the specific case—that we deemed deficient "empty conclusions." *Id.* at 193. This is the light in which our "outline of the chain of causation" language should be read.

Our medical malpractice opinions following *Sorenson* did not change this standard. In *Stroud*, we considered an affidavit that included the following opinion on causation and nothing more: "I . . . will testify that as a result of the breach of the standard of care . . . there was a failure to diagnose and treat a subarachnoid hemorrhage which ultimately resulted in a complicated hospital course and death of the Plaintiff." 556 N.W.2d at 554. We followed the test we articulated in *Sorenson* and concluded that the affidavit was deficient for failure to provide an outline of the chain of causation:

> According to [the] death certificate, [the] immediate cause of death was a pulmonary embolism, not a subarachnoid hemorrhage. [The expert's] June 21 affidavit does not connect [the plaintiff]'s pulmonary embolism to the delay in diagnosing the subarachnoid hemorrhage; rather, [the expert] simply opines that the delay in diagnosis caused a "complicated hospital stay."

*Id.* at 556. In other words, the affidavit stated that the doctor's failure to diagnose and treat one condition (subarachnoid hemorrhage) led to the plaintiff's death, but never discussed a different condition (pulmonary embolism) that was the actual cause of her death.

In our analysis in *Stroud*, we stated that supplementing an affidavit with the death certificate "is not a substitute for an expert medical opinion setting forth in detail the causal connection between [the providers'] conduct and [the plaintiff's] death because it does not provide *any explanation* of how that conduct led to her death." *Id.* (emphasis added). The

26

"detail" referenced in the sentence means that a case should be dismissed when there is no explanation of how the provider's conduct led to the patient's death; precisely what we said in *Sorenson*—that the affidavit must include at least "*something* about the substance of the facts and opinions regarding the alleged negligence and a summary of the grounds for each opinion." *Sorenson*, 457 N.W.2d at 190 (emphasis added). *Stroud* simply contains no hint that we were challenging or changing, let alone overruling, our clear statement in *Sorenson* that an expert in a medical malpractice case is not required to make a "detailed disclosure."

In *Lindberg v. Health Partners, Inc.*, 599 N.W.2d 572, 576–77 (Minn. 1999), we relied on *Sorenson* and *Stroud* and held that a short, 6-paragraph affidavit that did not recite *any facts* upon which the expert was basing his opinion was deficient.[10] We explained:

---

[10]    The affidavit stated in full:

1. I am a board-certified specialist in obstetrics and gynecology.
2. This affidavit is to explain my opinions in this case pursuant to Minn. Stat. § 145.682.
3. I am familiar with the standard and duty of care applicable to doctors, midwives, nurses and other medical personnel in the Twin Cities of Minnesota area.
4. Based upon a reasonable degree of medical certainty, it is more probable than not, that if, among other things, Debra Lindberg had been instructed to seek medical treatment at the time of her phone call on the morning of March 28, 1994, Lukas Stewart Lindberg would not have died.
5. Based upon a reasonable degree of medical certainty, Lukas Stewart Lindberg died as a result of the negligent and careless conduct of the Defendants and/or their agents and employees, including [the midwives].
6. That the opinions contained in this affidavit, are based upon my years as a board certified specialist in obstetrics and gynecology, the review of the medical records concerning Debra Lindberg, my experience in working with patients having similar medical conditions, diagnosis and treatment, and my general familiarity with medical literature.

*Lindberg*, 599 N.W.2d at 574–75.

27

> [The affidavit] states that [the expert] is familiar with the applicable standard of care but fails to state what it was or how the appellants departed from it, it fails to recite any facts upon which [the expert] will rely as a basis for his expert opinion, it fails to outline a chain of causation connecting the alleged failure to instruct [the plaintiff] to seek immediate medical attention with the stillbirth of the decedent[,] and it fails to even identify the medical condition for which [the plaintiff] allegedly was not given attention.

*Id.* at 578.

We said in passing and without analysis that a "general disclosure" like that offered by the expert in the case is not sufficient. *Id.* Nothing in the opinion suggests, however, that we were rejecting our clear statement in *Sorenson* that an expert in a medical malpractice case is not required to make a "detailed disclosure." *See Sorenson*, 457 N.W.2d at 191. *Lindberg* certainly does not say that. Rather, a "general disclosure" as we used that term in *Lindberg* is the same as the "empty conclusion" to which we referred in *Sorenson*—a broad, general statement without any reference to the facts of the specific case. More to the point, our comment that a "general disclosure" is not sufficient does not mean that a disclosure more detailed than that required by our decision in *Sorenson* is necessary.

*Anderson v. Rengachary*, 608 N.W.2d 843 (Minn. 2000), was a medical malpractice case involving a spine surgery gone wrong. The patient alleged the defendant doctor negligently caused a severed vagus nerve and swelling of her esophagus and thyroid. *Id.* at 844–45. We applied the *Sorenson*/*Stroud*/*Lindberg* standard and held that the affidavit of the plaintiff's expert was deficient, explaining:

> In his affidavit, [the expert] addressed alleged injuries to both the esophagus and the vagus nerve. As to the esophagus, [the expert] defined the standard of care by stating "esophageal trauma should be avoided during surgery of

28

this type." He did not state what particular measures a physician should take to avoid such trauma. He also failed to describe the defendant's acts or omissions that allegedly violated the standard of care and caused the injury. Regarding causation, [the expert] stated "there was a deviation from the standard of care provided to this patient which caused the patient to have postoperative dysphasia [sic] of undetermined etiology." The phrase 'undetermined etiology' suggests that the cause of [the patient's] injury is unknown and perhaps unrelated to the surgery performed. . . . Thus, [the expert] failed to adequately describe the alleged negligence on the part of the [defendant provider] and its relationship to [the plaintiff's] injury.

[The expert] also discussed a possible injury to the vagus nerve. He explained that the standard of care requires avoiding injury to the vagus nerve but again failed to describe the actions a physician should take to avoid such injury. He also did not identify the acts or omissions of the [defendant provider] that violated the standard of care or even state definitively that the vagus nerve was in fact injured. [The expert] made no attempt to outline a chain of causation resulting in injury to the vagus nerve.

*Id.* at 848.

After concluding that the expert affidavit was deficient, we addressed the separate issue of whether the district court erred in denying a 30-day extension to submit a supplemental affidavit. (At the time, the opportunity to cure provision now found in section 145.682, subdivision 6(c)(3), did not exist.) The court of appeals had reversed because the experts provided "some meaningful disclosure" of their testimony in the initial affidavit. *Id.* We disagreed with the court of appeals, stating in part that the initial affidavit did "not provide any meaningful disclosure regarding how the standard of care was violated or what that standard required." *Id.* at 849. Once again, our use of the modifier "meaningful" does not suggest any higher level of detail or rigor in a medical malpractice expert affidavit than that required under *Sorenson*. Indeed, that was how we treated the language in *Anderson* 2 years later in *Teffeteller*, 645 N.W.2d at 430, in which we equated

"meaningful disclosure" with the basic *Sorenson* standard: the affidavit must "set[] forth the standard of care, the act or omissions violating that standard, and the chain of causation."[11]

In short, we reaffirm our holding in *Sorenson* that under section 145.682, when an expert opinion is necessary to allow the jury to draw reasonable inferences without speculating, a plaintiff in a medical malpractice case must submit an expert affidavit that "outlines a chain of causation." To satisfy that requirement, the expert affidavit must include an opinion on causation that is supported with reference to specific facts in the record connecting the conduct of the defendant provider to the injury suffered by the harmed patient. To support a summary judgment motion in a medical malpractice case where expert testimony is needed, the expert must provide an opinion with proper foundation and enough information about the specific case to reassure the court that the jury will have sufficient information to draw a reasonable inference—without speculating—that the provider's conduct caused the plaintiff's injury. This is the same

---

[11]  In a footnote in *Teffeteller*, we explained that an expert affidavit is deficient if it fails to satisfy any one of the three *Sorenson* requirements. 645 N.W.2d at 429 n.3. In addressing that question, we described in passing the third *Sorenson* requirement as "outlin[ing] a detailed chain of causation." *Id.* We had never used that formulation of the language before and in the body of the opinion we accurately stated the third *Sorenson* requirement: "The expert affidavit must . . . include an outline of the chain of causation between the violation of the standard of care and the plaintiff's damages." *Id.* at 428. Our modified formulation in footnote 3 of *Teffeteller* did not signify a shift away from our rejection of a "detailed disclosure" requirement in *Sorenson*. Nor did it create a new requirement mandating anything more than statements of opinion—supported with reference to specific facts—connecting the conduct of the defendant to a breach of the proper standard of care and the plaintiff's injury.

standard that applies to any plaintiff facing a summary judgment challenge to a negligence claim that requires expert testimony.

A review of the facts and the affidavits in each of our cases in the line from *Sorenson* to *Teffeteller* demonstrates that the affidavits in each case failed the basic test articulated in *Sorenson*. We reaffirm that principle today.

In sum, the amount of proof necessary to avoid summary judgment on causation is no different in medical malpractice cases than the level of proof in ordinary negligence cases. A plaintiff must provide evidence that, if the evidence and inferences to be drawn from the evidence are accepted as true, it is more probable than not that the plaintiff's injury was a result of the defendant's negligence. *Dickhoff*, 836 N.W.2d at 337. If a layperson could not reasonably understand and make inferences concerning the connection between the breach of duty and injury, then a plaintiff must support her claim of causation with expert testimony. *Bernloehr*, 208 N.W.2d at 755; *Pagett*, 167 N.W.2d at 64. To show causation in circumstances where expert testimony is necessary, the expert affidavit must include an opinion with proper foundation and enough information about the specific case to reassure the court that the jury will have sufficient information to draw a reasonable inference—without speculating—that the provider's conduct caused the plaintiff's injury. The "outline of the chain of causation" need not be any more detailed than is required in an ordinary negligence claim involving expert testimony. And in so stating, we are in no way suggesting any change in how we address proof of causation in routine common-law negligence cases.

31

## II.

We now turn to whether the evidence in the record, including the expert affidavit submitted by Dr. Keeperman, shows a genuine issue of material fact on the question of causation. In other words, we consider whether a jury could reasonably believe that ACR's failure to seek immediate emergency care for Amy was a substantial cause of Amy's death. As discussed above, in making that determination we view all the facts and inferences from the facts in Rygwall's favor.

We observe at the outset that Dr. Keeperman's affidavit contains much more robust detail about the specifics of Amy's case than the affidavits in the line of cases from *Sorenson* to *Teffeteller*. On causation, Dr. Keeperman expressly stated his opinion to a reasonable degree of medical certainty that had Amy's condition been "immediately acted on with rapid evaluation and treatment, there is a reasonable degree of medical certainty her condition never would have deteriorated to ARDS, septic shock, multi-system organ failure, and ultimately her death."

As discussed more fully below, in support of this opinion, Dr. Keeperman discussed numerous specific facts from the record connecting the specific conduct of ACR to the injury suffered by Amy. Based on information in the record that was specific to Amy, he identified the treatment Amy would have received (aggressive administration of antibiotics) and the mechanism by which the treatment she received would have interrupted Amy's deadly progression (medical studies showing that, for each hour of delay in administering antibiotics, the risk of morbidity and mortality for someone in Amy's condition increases). Dr. Keeperman's 10-page affidavit explains "how" and "why" ACR's

32

alleged malpractice caused Amy's injury. *See Teffeteller*, 645 N.W.2d at 429 n.4. ACR may disagree with that "how" and "why"—or find the explanation lacking—but that is an argument ACR can make to the jury. For the reasons we explain below, there is sufficient support in this case for a chain of causation from which a jury may draw a reasonable inference—without speculating—that ACR's conduct caused Amy's worsening condition and death.

ACR's primary argument is that Rygwall did not establish that Amy would not have died even if she had received emergency care soon after she exhibited respiratory distress and aspirated after lunch at Rise.[12] ACR identifies two purported gaps in the chain of causation: (A) Rygwall has not established that, had ACR sought emergency medical treatment, Amy would have received the antibiotics that would have saved her life; and (B) Rygwall has not established that earlier administration of antibiotics would have interrupted Amy's progression to more serious illness and death. We address each in turn.

A.

Regarding the first assertion—that Rygwall provided no evidence that Amy would have received antibiotics had she sought emergency medical treatment earlier—we disagree. Dr. Keeperman is a certified emergency medicine and critical care doctor. The reports upon which Dr. Keeperman relied state that hospitals routinely administer

---

[12]    As an initial matter, it is important that, at this stage of the proceedings, ACR is not disputing that it had a duty to seek immediate emergency care for Amy in response to her respiratory distress and aspiration after lunch. Nor does ACR yet dispute it had a duty to provide complete information about Amy to other health care providers who saw Amy following the incident. ACR also does not contest that Amy's aspiration pneumonia resulted in sepsis, major organ failure, ARDS, and death.

33

antibiotics to patients with symptoms of sepsis. Moreover, Dr. Keeperman expressly notes (and the record supports) that Regions Hospital gave Amy antibiotics almost immediately upon her arrival to address "presumed aspiration pneumonia." This was because the doctors at the emergency department (unlike providers at urgent care) were immediately told that Amy might have aspirated.

ACR argues that Amy's respiratory distress was increasing and her condition was worse when she arrived at Regions Hospital than it was immediately after the aspiration event at Rise. ACR urges that there is no guarantee that the emergency department provider who saw Amy more immediately after the aspiration event at Rise occurred—or at any time before 3:30 p.m., when her lips started to turn blue—would have acted with the same urgency or administered antibiotics.[13]

---

[13] ACR also relies on testimony that Amy had "returned to baseline" and looked like her normal self between the time she had her aspiration event at Rise and when she arrived at the St. Paul clinic. But Rygwall points to other evidence in the record that Amy was continuously in respiratory distress. For instance, Rise staff noted that she continued to have watery eyes and foamy saliva. Contrary to A.J.'s claims, staff at Rise testified that Amy "was not acting like her normal self." Further, A.J. is not a health care professional equipped to determine Amy's actual health condition; it is not clear what her conclusions that Amy "looked like her normal self" and "returned to baseline" mean. Dr. Keeperman's affidavit expressly states that individuals do not typically "go back to baseline" and then drastically decline again. And A.J. testified that she had no explanation to refute that position. A.J. told DHS investigators that Amy's breath continued to rattle on the way to the St. Paul clinic. Further, neither A.J. nor anyone from ACR assessed Amy's respiration rate or took other steps to monitor her condition aside from observing her in the rearview mirror during that time. When Amy arrived at urgent care, her condition was bad enough that the clinic saw her immediately, even though other patients had been waiting longer.

Moreover, even if the respiratory distress may have subsided to some extent, the record supports that other effects of aspiration did not go away. Her breath was raspy, her color was off, her respiration was elevated, and her oxygen was not within normal range. At the summary-judgement stage, we resolve factual disputes and inferences in the

34

On the other hand, had ACR immediately sought emergency care for Amy following the incident, it still would have been ACR's obligation (per Dr. Keeperman, whose account we accept at summary judgment) to fully inform those health care professionals of all the details of her medical condition: that Amy had a seizure disorder and propensity for choking on food; that she had multiple seizures in the 24 hours before the choking incident; that following lunch, Amy exhibited several symptoms of respiratory distress including coughing, foaming, clear saliva that dampened her shirt such that it had to be changed, weakness, pale to flush complexion, and rough breathing; that the nurse at Rise listened to her lungs and heard rattling; and that ACR suspected that Amy had aspirated.[14] The hospital records upon which Dr. Keeperman relied show that Amy, almost immediately upon arrival, was treated with antibiotics based on concern about "potential aspirational pneumonia." The studies Dr. Keeperman identified suggest that antibiotic treatment is routine intervention to avoid deterioration related to sepsis. Thus, we conclude that there is sufficient evidence in the record to allow a reasonable jury to conclude without

_____

nonmoving party's favor. *Staub*, 964 N.W.2d at 620. As a result, where it is supported by facts in the record, we must adopt Rygwall's version of events.

[14] The dissent focuses its attention narrowly on Amy's condition when she was at the St. Paul clinic. And it is true that Amy's condition seemed to decline between her arrival at the St. Paul clinic and her arrival at the emergency department. As discussed *supra* at n.2, we do not agree that record supports the kind of rapid decline that the dissent sees in the record. More importantly, however, we do not agree that Amy's arrival at the St. Paul clinic is the only or even most important comparator. As set forth above, the record construed in favor of Rygwall shows that the information about Amy's background and the signs that prompted the administration of antibiotics at Regions Hospital would have also been similarly apparent to health care personnel had ACR sought immediate emergency care and fulfilled its obligation to describe the event as well as Amy's background health condition and symptoms following the aspiration event.

speculation that it is more probable than not that antibiotics would have been administered to Amy had she been taken for emergency treatment immediately after ACR learned about the aspiration event at Rise.[15]

Similarly, the dissent argues that it might not have been possible for ACR to get Amy to the emergency department quickly enough to avoid her death. But the phrase in Dr. Keeperman's affidavit that delays in administration of antibiotics "by as little as 30 minutes have been demonstrated to significantly increase mortality" does not mean that the antibiotics had to be administered within 30 minutes or the game was up. Consideration of the underlying reports and the affidavit as a whole show that is not what Dr. Keeperman was saying in his affidavit. Further, although Dr. Keeperman's affidavit is not always clear on the timeline of events, sorting out the facts of the timeline (i.e., when the aspiration event occurred, when ACR was notified, and how quickly Amy could have received emergency treatment) is the type of factual dispute a layperson juror could understand. Although the dissent disclaims the notion that Dr. Keeperman had to identify a precise tipping point for when administration of antibiotics would be too late, that is the practical result of its position. That is not the standard we apply in Minnesota, and it would often be an impossible standard to satisfy. *See Schopf v. Red Owl Stores, Inc.*, 323 N.W.2d 801,

---

[15]     Of course, there is no guarantee that the jury would draw such an inference. ACR may certainly point out Amy's increased respiratory distress when she arrived at Regions Hospital, that she was not provided antibiotics when at the St. Paul clinic, and that the reports upon which Dr. Keeperman relied have limitations. But based on the procedural posture of this case on summary judgment, the fact that Rygwall may "face an uphill battle in proving the existence of . . . causation" does not deprive her of "an opportunity to prove [causation]. Such an opportunity is consistent with our longstanding approach to tort law." *Dickhoff*, 836 N.W.2d at 338 n.17.

803 (Minn. 1982) (stating that testimony from a medical expert "does not have to express absolute certainty"); *Bernloehr*, 208 N.W.2d at 755 (noting it is not necessary "that an expert speak with confidence excluding all doubt").

Focusing on a specific argument the dissent raises on this point is useful in getting to the heart of the difference of opinion between the majority and the dissent in this case. The dissent observes that the nurse at the St. Paul clinic did not administer antibiotics to Amy during the half hour that Amy spent there and points to that as rebuttal evidence that a different professional in a different setting—an emergency department doctor provided with complete information about Amy's background condition—would have made the same decision.[16] The dissent's analysis may ultimately prove decisive to a jury. But in our view, that is putting the cart before the horse. The plaintiff's expert is not obligated to refute every alternative narrative the defendant may offer. The expert must provide that expert's version of the "how" and "why" of causation, *Teffeteller*, 645 N.W.2d at 429 n.4, which Dr. Keeperman did here.

For these reasons, we conclude that Rygwall created a genuine issue of material fact as to whether Amy would have received antibiotics had she sought emergency medical treatment earlier.

---

[16] The dissent similarly concludes that the St. Paul clinic diagnosed Amy with "mere congestion." In doing so, the dissent relies on notes from the St. Paul clinic that state that Amy's "Chief Complaint" (presumably communicated by A.J.) is "Congestion (foaming at the mouth)." We are not convinced the dissent is interpreting the clinic notes accurately. Again, such disputes are best resolved by the jury.

B.

We also disagree with ACR's assertion that there is no evidence in the record showing that earlier administration of antibiotics would have interrupted Amy's progression to more serious illness and death.[17] ACR seizes on language that its actions "contributed to" Amy's death and argues that those statements are conclusory.[18] Dr. Keeperman expressly opined in his affidavit that early and aggressive intervention with antibiotics decreases both morbidity and mortality in patients with sepsis and septic shock—one of the links in the chain of Amy's deterioration and death. He cited medical research that delay in administering antibiotics increases the risk of worsening health (morbidity) and death. More specifically, one of the findings in the reports states that for each hour of delay, it is increasingly *more* likely it is that the patient will become more ill and die.

We conclude that there is sufficient evidence in the record to allow a reasonable jury to conclude, without speculation, that had ACR taken Amy for emergency treatment

---

[17] We disagree with the district court's conclusion that Rygwall did not sufficiently describe the specific treatment that would have prevented Amy's aspiration and aspiration pneumonia from deteriorating into sepsis, organ failure, ARDS, and death. Dr. Keeperman's affidavit is quite clear that the treatment mechanism he has in mind is the administration of antibiotics. The district court's suggestion that Dr. Keeperman needed to provide more detailed description of the treatment protocol—for instance, the need to identify the specific type of antibiotic—is incorrect in this case.

[18] That Dr. Keeperman said "contributed to" rather than "caused" or "were a substantial factor in" is of no consequence. Causation is established (or not) based on "the substance of the testimony of the expert witness and does not turn on semantics or on the use by the witness of any particular term or phrase." *Boldt v. Jostens, Inc.*, 261 N.W.2d 92, 94 (Minn. 1977) (quoting *Ins. Co. of N. Am. v. Myers*, 411 S.W.2d 710, 713 (Tex. 1966) (internal quotation marks omitted)).

immediately after ACR learned about the aspiration event at Rise, she would have been timely treated with antibiotics, and her condition would not have deteriorated into the sepsis, organ failure, and ARDS that resulted in her death.

In sum, Rygwall raised a genuine issue of material fact as to whether ACR caused her daughter's death. Based on this record, a reasonable jury could find in Rygwall's favor on the issue of causation, and therefore summary judgment for ACR is inappropriate.

## CONCLUSION

For the foregoing reasons, we reverse the decision of the court of appeals and remand to the district court for further proceedings consistent with this opinion.

Reversed and remanded.

ANDERSON, Justice (concurring in part, dissenting in part).

Although I agree with the court's holding that Minn. Stat. § 145.682 (2022)—and the cases interpreting it—did not create a higher bar for causation in medical malpractice cases, I disagree that the expert affidavit here was sufficient to establish causation. Accordingly, I concur as to Part I of the court's opinion but otherwise respectfully dissent.

ACR found two gaps in the chain of causation: would Amy have received earlier treatment had ACR called 911, and would that treatment have prevented Amy's death? While the court concludes a jury could answer these questions in favor of Rygwall, I disagree.

## A.

Upon examination, the first gap requires not one, but a series of leaps. The court assumes that, had ACR called 911, Amy would have been immediately evaluated, properly diagnosed, *and* promptly treated with antibiotics. If the chain breaks at any of these steps, Rygwall cannot establish causation.

To establish causation in cases of failure to diagnose or delay of treatment, a plaintiff must establish that it is more likely than not the plaintiff would not have been injured had the defendant met the standard of care. Minnesota applies the substantial-factor test for causation: a plaintiff must establish that it is more likely than not that the negligent act was a substantial factor in the harm's occurrence. *Staub as Tr. of Weeks v. Myrtle Lake Resort, LLC,* 964 N.W.2d 613, 620 (Minn. 2021). "[I]f the harm would have occurred even without the negligent act, the act could not have been a substantial factor in bringing about

the harm." *George v. Est. of Baker*, 724 N.W.2d 1, 11 (Minn. 2006). "The classic test for determining factual cause is to compare what actually happened with a hypothetical situation . . . without the negligent act." *Id.* The court discusses at length the events that actually occurred: Amy aspirated, which led to sepsis, which led to ARDS and ultimately her tragic death. But no one disputes, in this summary judgment motion, the scientific mechanisms that led to Amy's death. The chain of causation that Rygwall must establish is the hypothetical sequence of events had ACR acted as Rygwall contends it should have. *See Lindberg v. Health Partners, Inc.*, 599 N.W.2d 572, 577 (Minn. 1999) (noting that causation requires a complete chain connecting "the violation [of] the standard of care and the plaintiff's damages"). Thus, in a claim involving delayed treatment, a plaintiff must establish that, had the standard of care been met, reasonable medical professionals would have promptly evaluated, diagnosed, and treated the individual, resulting in no injury to the plaintiff. *See id.*

Indeed, under the court's reasoning, it is hard to understand what "chain" of causation a plaintiff must prove. A chain typically involves a series of linkages. But the court lets Rygwall skip several steps and scrape by with a single (tenuous) connection: that treatment would lead to a different prognosis. Note the glaring qualifier in Dr. Keeperman's affidavit: "*had Amy Rygwall's change in clinical status been immediately acted on with rapid evaluation and treatment*." Dr. Keeperman just assumes the first three links in the chain—evaluation, proper diagnosis, and timely treatment—without giving the jury a reason to think this would have occurred.

Plaintiffs in some medical malpractice cases might establish, with non-expert testimony, that a particular course of treatment would have been timely received. This, however, is not one of those cases. The court relies upon the treatment Amy ultimately received at the emergency department and assumes that she would have received the same treatment—on a similarly rapid timeline—had ACR immediately called 911.

Because ACR moved for summary judgment, we draw inferences in Rygwall's favor. *Staub*, 964 N.W.2d at 616. But we also cannot allow a jury to speculate as to issues of medical causation. *Leubner v. Sterner*, 493 N.W.2d 119, 121 (Minn. 1992). If Amy presented with a certain set of symptoms at 4 p.m. and received proper treatment, and if she would have presented with the same symptoms 3 hours earlier, a jury could infer she would have received the same treatment. But that is not the case here.

Crucially, Amy's symptoms at 3:05 p.m. (when first evaluated at urgent care) were completely different than her symptoms when she arrived at the emergency department at 3:53 p.m. At 3:05, Amy's vital signs were largely normal, and her oxygen saturation was 94 percent. Based on this, the urgent care nurse did not administer antibiotics, call 911, or otherwise suggest that Amy's life was in danger; she diagnosed Amy with "congestion." At approximately 3:30, Amy's lips started to turn blue, so the urgent care nurse put her on oxygen and called 911. By the time she arrived at the hospital at 3:53, doctors observed audible gurgling sounds, and oxygen saturation of just 65 percent. Accordingly, they classified her as "critically ill" and administered antibiotics. Her condition at 3:53 was a far cry from the normal vital signs she exhibited an hour earlier.

Stated differently, for many medical conditions, a layperson would not know how a hospital would diagnose and treat various symptoms. (This is especially true when someone has communication barriers and a complicated medical history.) If a second person had the same symptoms and received a particular course of treatment, a jury could infer that the first person would be treated similarly. But if two individuals (or the same individual at different times) exhibited different symptoms, a jury can no longer infer that they will receive similar treatment. At that point, the expected medical treatment veers into mere speculation.

Again, it is undisputed that Amy's clinical condition markedly changed at approximately 3:30 p.m. The court insists that ACR should have informed emergency medical providers that Amy aspirated and that this, coupled with the inherent urgency of a 911 call, would lead to close observation and a diagnosis of sepsis. The court suggests it is significant that the urgent care nurse did not listen to Amy's lungs, implying that an emergency care physician would have listened to her lungs earlier and already heard signs of fluid buildup.

That outcome is possible. But nothing in the record affirmatively allows a jury to conclude that such evaluation would have occurred. *See Walton v. Jones*, 286 N.W.2d 710, 715 (Minn. 1979) ("[E]xpert testimony in a medical malpractice case must be more than consistent with plaintiff's theory of causation; the expert testimony must demonstrate a reasonable [p]robability that defendant's negligence was the proximate cause of the injury.").

Trained medical experts at Rise and the St. Paul urgent care concluded that although Amy's condition warranted investigation, it did not require immediate administration of antibiotics. Although Rygwall argues that "common experience" indicates that doctors treat respiratory conditions as urgent, the urgent care nurse—a trained medical professional—here described Rygwall's condition as mere congestion. And common experience cannot explain how quickly a non-verbal individual with a complicated medical history would be evaluated and diagnosed. Simply put, Rygwall needed to provide expert testimony regarding the course of treatment here, and she failed to do so.

In short, the non-expert evidence in the record here was not enough for a jury to conclude that, but-for ACR's alleged negligence, Amy would have survived. If Dr. Keeperman had explained that immediate treatment, along the lines of the emergency department's response at 3:30, would have occurred earlier and why he thinks so, the jury could so believe. But Dr. Keeperman did not establish that. As a result, he left a potential jury to speculate as to the treatment Amy would have received. Under our precedent, this claim cannot survive summary judgment. *Leubner*, 493 N.W.2d at 121 (noting that "a jury should not be permitted to speculate as to possible causes of a plaintiff's injury").

B.

Even if Rygwall had established that Amy would have received earlier treatment, she has not filled the second gap in the chain of causation: providing enough evidence that a jury could conclude that Amy would have lived. The court notes that expert testimony does not require a specific term or phrase. *Supra* at 38 n.18. I agree; I would not fault an expert for a slight change of verbiage. But the specific words used by experts are important

because, assuming adequate foundation, expert opinions—the specific words used by experts—may be treated by the jury as facts. *See Smith v. Rekucki*, 177 N.W.2d 410, 414 (1970).

Dr. Keeperman's repeated statements that ACR's actions "contributed to" Amy's death are conclusory. *See Teffeteller v. Univ. of Minn.*, 645 N.W.2d 420, 429 (Minn. 2002); *Lindberg*, 599 N.W.2d at 577. This is not because Dr. Keeperman used the wrong language—the problem with the medical evidence in this dispute is not remedied by stating that ACR's actions "caused" Amy's death or "substantially contributed to" it. The problem is that Dr. Keeperman does not explain "how" and "why" he reached those conclusions. *See Teffeteller*, 645 N.W.2d at 429 n.4. "Mere opinion without careful scientific investigation and examination will not alone sustain a verdict." *Bernloehr v. Cent. Livestock Ord. Buying Co.*, 208 N.W.2d 753, 755 (Minn. 1973).

We must look at the specific statements—claims if you will—used by the expert, because that is what a jury could treat as fact. Dr. Keeperman's only statement that Amy would have lived had a crucial qualifier: her condition would not have deteriorated *if* "Amy Rygwall's change in clinical status [at noon had] been immediately acted on with rapid evaluation and treatment." This highlights the missing links earlier in the chain—the affidavit assumes rapid evaluation and treatment, but nowhere establishes that those could have or would have been obtained. But more importantly, it assumes "immediate action" at the time Amy's clinical status changed—that is, when she started coughing at approximately 12 p.m. Immediate action was impossible because ACR was not even

notified of Amy's condition until 12:35 p.m.[1]  And Dr. Keeperman nowhere states that Amy's life could have been saved by treatment that was not both "rapid" and "immediate."

The court seems to infer that, in the context of the affidavit, "immediate" treatment refers to treatment obtained immediately after ACR was notified.  True, the affidavit describes the delay in Amy's treatment and then states that "[t]he delay in providing prompt treatment to the patient contributed to her eventual death."  But the affidavit nowhere even acknowledges the crucial fact that Amy aspirated at approximately noon and ACR was not notified until 12:35.  The affidavit instead states, contrary to the record, that the aspiration event occurred at "[a]round 12:30 p.m."  And, even though timing of treatment is a crucial issue in a delay-of-treatment case, the affidavit contains other mistakes as to timing.[2]

---

[1]    ACR's records indicate that it was not informed of the aspiration event until 1:15 p.m., while Rise's records stated that ACR was informed at 12:35 p.m.  We resolve factual disputes in favor of Rygwall, *Staub*, 964 N.W.2d at 616, which means that we assume ACR was notified at 12:35 p.m.

[2]    For example, the affidavit stated that:

> ACR staff arrived with the patient at HealthPartners – Como at 2:58 pm CST 12/15/2015.  By then, the patient's status had significantly deteriorated.  Health Partners – Como provider staff immediately called 911 . . . .  Records indicate that on arrival Amy was in "obvious respiratory distress" with "audible gurgling" and that her "lungs sound wet . . . ."

As the district court noted, this portion of the affidavit contains glaring errors.  When Amy arrived at urgent care at 2:58 p.m., the nurse did not listen to her lungs.  They took her vitals, and it was not until approximately 3:30 p.m. that Amy's lips started to turn blue.  At that time, an urgent care nurse listened to her lungs and heard signs of fluid buildup (rhonchi) and immediately called 911.  The first mention of "audible gurgling" was a note at the emergency department at approximately 3:57 p.m.

The possibility that Dr. Keeperman did not scrutinize the timing of Amy's deterioration gains additional force when one considers that Dr. Keeperman's only other statement about timing of treatment was that delays of "as little as 30 minutes" significantly increase mortality. Even if ACR had acted as fast as possible, treatment would still be outside that 30-minute window. The legal standard applicable here does not require us to fault ACR for failing to do something that it could not possibly do. *See George*, 724 N.W.2d at 11; *see also* Immanuel Kant, *Critique of Pure Reason* 540 (Paul Guyer & Allen W. Wood, eds. & trans., Cambridge University Press 1998) (1781) (observing that the statement one ought to do something implies that they can do it). Plaintiffs must establish causation so defendants are not saddled with liability for a plaintiff who would have died regardless of the defendant's negligence. *Cf. Burrage v. United States*, 571 U.S. 204, 212 (2014) ("[I]t makes little sense to say that an event resulted from or was the outcome of some earlier action if the action merely played a nonessential contributing role in producing the event.").

True, Dr. Keeperman notes that delays "as little as" 30 minutes significantly increase mortality, which suggests that longer delays continue to increase mortality. But to establish causation, the necessary treatment time cannot be a lower bound. We could not assume, based on that statement, that treatment 10 days after Amy started showing symptoms would have prevented her death, simply because the risk of mortality increases over time. Rygwall needed to establish, to a reasonable degree of medical certainty, that treatment within some timeline would have saved her life. The only timelines that Dr.

Keeperman gives us are "as little as 30 minutes" and "immediate." Neither was possible for ACR.

Based on this factual record—and considering that record in the light most favorable to Rygwall—we know that by the time ACR was notified of the aspiration event, the risk of mortality had already increased "significantly." We know that the odds of death were continuing to rise, but we do not know how fast, or when was the point of no return, at which point treatment was ineffective and too late. This is not to say that Dr. Keeperman needed to state, with absolute certainty, the timeline on which Amy needed to be treated in order to survive. But he did need to explain the basis for his conclusion that earlier treatment would have avoided Amy's death. *Teffeteller*, 645 N.W.2d at 429 n.4 ("The gist of expert opinion evidence as to causation is that it explains to the jury the 'how' and the 'why' the malpractice caused the injury."). This Dr. Keeperman failed to do. Simply put, Dr. Keeperman did not establish—nor did the remainder of the record—that had Amy received earlier treatment, it is more likely than not that she would have lived.

\* \* \*

For the foregoing reasons, I respectfully dissent.


HUDSON, Chief Justice (concurring in part, dissenting in part).

I join in the concurrence in part and dissent in part of Justice Anderson.