# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-1464
_____

Mario Ferbo Mancini

*Plaintiff - Appellant*

v.

United States of America, FTCA Claim

*Defendant - Appellee*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: December 17, 2024
Filed: April 18, 2025
_____

Before SMITH, GRUENDER, and STRAS, Circuit Judges.
_____

SMITH, Circuit Judge.

Mario Mancini sued the United States (government), alleging state law medical malpractice under the Federal Tort Claims Act (FTCA). According to Mancini, the government caused him permanent injury by negligently delaying necessary medical care. Both parties submitted expert reports. The government moved for summary

judgment and to exclude Mancini's proposed expert testimony. The district court[1] granted the government's motion and dismissed the action with prejudice, pursuant to Minn. Stat. § 145.682. Mancini appeals. For the following reasons, we affirm.

## I. *Background*

Mancini, who has been incarcerated since 2002, has served his prison term at the Federal Correctional Institution at Sandstone, Minnesota (FCI Sandstone) since 2014. In the 1990s, prior to his incarceration, Mancini sustained a workplace injury. He has since endured consequent neck and back pain. Prior to his incarceration at FCI Sandstone, Mancini underwent a CT scan in 2010 that showed mild to moderate cervical spondylosis with multilevel disc degeneration and suspected osteophyte disc complexes. In 2014, Mancini reported a twinge in his neck causing pain and numbness in his right arm and fingers.

On June 30, 2017, Mancini reported that he had reaggravated his neck injury while lifting a box. The nurse observed that Mancini was experiencing the same symptoms he had in the past, such as numbness, tingling, and pain radiating from the neck into the arm and fingers. Additionally, she noted that Mancini experienced no loss of function or strength. Mancini received pain medication. The following day, July 1, Mancini again complained of pain. He was given enough ibuprofen to get through the holiday weekend. On July 2, Mancini reported increasing pain and numbness in his hand. On July 5, Dr. Thomas Mayer and physician's assistant (PA) Jenefer Southwick each examined Mancini; they each noted pain and numbness but no weakness. On July 20, Dr. Mayer again examined Mancini. Dr. Mayer recorded, for the first time, that Mancini was experiencing weakness in his right arm; however, Dr. Mayer mentioned in his notes that tricep weakness was "first noted 2–3 weeks

---

[1]The Honorable Eric C. Tostrud, United States District Judge for the District of Minnesota.

-2-

ago at onset of current episode." R. Doc. 178-2, at 55. Dr. Mayer ordered an urgent MRI with a target date of July 31, 2017.

On August 7, 2017, Mancini underwent an MRI. It showed little change from the 2010 CT scan. The MRI results reported "[n]o cord compression or abnormal cord signal." R. Doc. 178-9, at 2. FCI Sandstone's Acting Clinical Director, Dr. Paul Harvey, recommended that Mancini consult with a neurosurgeon within 30 to 60 days. On August 29, Mancini consulted with neurosurgeon Dr. Steven Broadway. Dr. Broadway recommended that Mancini undergo an anterior cervical discectomy and fusion (ACDF). Dr. Broadway informed Mancini of the risks, including damage to the nerves and spinal cord. Mancini agreed to the surgery. Because "no timeline was recommended" in the initial consult report, PA Southwick called Dr. Broadway's office to obtain a "more direct schedule for surgery." R. Doc. 178-19, at 1. Dr. Broadway amended the consultation report with the recommendation that surgery be performed within 60 days—by October 30, 2017. Dr. Harvey approved the surgery to be performed within 90 days or on the first available date.

Mancini's surgery was scheduled for October 18, 2017. Per Health Services' standard procedure, Mancini was to be placed in the Special Housing Unit (SHU) to ensure he did not eat for 12 hours prior to surgery. But a Health Services Assistant sent an email containing the wrong date to the staff members responsible for placing inmates in the SHU. As a result, Mancini was allowed to eat before the surgery. Consequently, the surgery was rescheduled and performed on November 27, 2017. On December 13, 2017, Dr. Mayer noted weakness and atrophy in Mancini's right triceps. Following the surgery, Mancini experienced a loss of strength and continued pain and numbness.

Mancini sued the government and several other entities and individuals, alleging state law medical malpractice under the FTCA and constitutional violations under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403

U.S. 388 (1971). The district court dismissed all but the FTCA claim against the government. In support of his medical malpractice claim, Mancini submitted an initial expert-disclosure affidavit by Dr. Tanzid Shams. *See* Minn. Stat. § 145.682. The government moved for summary judgment, arguing that Dr. Shams's expert affidavit failed to meet the standards required under Minnesota law governing medical malpractice claims. Mancini obtained a new expert affidavit from Dr. Gary Wyard, a board-certified orthopedic surgeon, and the government withdrew its motion.

Dr. Wyard's expert affidavit provides:

I, Dr. Gary Wyard, being duly sworn, state the following:

1.      My name is Gary Wyard, M.D., and I am of sound mind, lawful age, and in all other respects competent to execute this Affidavit.

2.      I am licensed to practice medicine by the state of Minnesota. I am a board certified Orthopedic Surgeon.

3.      My previous positions include (*see curriculum vitae*).

4.      I have reviewed the medical records available to the Plaintiff concerning the allegations contained in the complaint. These records, in addition to my education, training, professional experience, and knowledge of the applicable standard of care form the basis of the following opinions.

5.      In my opinion, Defendant deviated from the applicable standard of care while treating Plaintiff Mario Ferbo Mancini ("Plaintiff") by, on multiple occasions, failing to treat Plaintiff in the appropriate amount of time.

6.      Plaintiff, an inmate at FCI Sandstone, first alerted Health Services providers to weakness, numbness, and pain in his right arm on July 1, 2017.

7.    After returning to Health Services with increasingly worsened symptoms a number of time[s], Dr. Thomas Mayer administered a strength test to Plaintiff's right arm on July 21, 2017. Dr. Mayer ordered an urgent MRI to he performed on Plaintiff by July 31, 2017. Plaintiff did not receive the MRI until August 7, 2017.

8.    This initial undue delay in care was the first in a number of deviations from the proper standard of care in Defendant's treatment of Plaintiff.

9.    Plaintiff's MRI showed herniation of his cervical spine and spinal cord compression. Plaintiff's records indicate that he was told his injuries were not emergent.

10.   On August 29, 2017, Plaintiff was seen by neurosurgeon Dr. Jarod Broadway, who concluded that Plaintiff needed an Anterior Cervical Discectomy and Fusion ("ACDF") surgical procedure as soon as possible to avoid permanent damage to his arm and hand. The ACDF was not scheduled until October 18, 2017.

11.   Plaintiff did not receive the ACDF, as Plaintiff was not put on NPO (nothing by mouth) status twelve hours before his surgery contrary to Health Services policy.

12.   The failure to ensure that Plaintiff was put on NPO status prior to his surgery prevented Plaintiff from receiving his ACDF; this failure and resulting delay was a further deviation from the preoperative standard of care.

13.   Plaintiff ultimately received his ACDF on November 30, 2018, ninety-three days after Dr. Broadway recommended surgery as soon as possible.

14.   This string of delays resulted in Plaintiff's symptoms worsening significantly between July 1, 2017 (when he first reported his injury to Health Services) and November 30, 2018 (when he finally received his surgery).

15. As a result of Defendant's deviations from the standard of care for an ACDF, Plaintiff has suffered permanent nerve damage, loss of strength, muscle atrophy, numbness, and pain in his anterior shoulder, tricep, hand, and fingers.

16. I reserve the right to update and amend this affidavit upon receipt of additional documents, testimony, or other information.

R. Doc. 177-4, at 1–3.

The government moved for summary judgment and to exclude Dr. Wyard's expert testimony. The government argued that it was entitled to summary judgment because Mancini was unable to prove an essential element of his case. According to the government, "[p]laintiff's supplemental expert-disclosure affidavit fails to meet the substantive requirements of Minnesota law; and second, the opinions in that disclosure are inadmissible under Federal Rule of Evidence 702. Without expert testimony, [p]laintiff cannot prove his medical malpractice claim as a matter of law." R. Doc. 176, at 17.

The government identified four alleged factual errors in Dr. Wyard's affidavit:

(1) it misstates the date [p]laintiff first presented with weakness; (2) it says the MRI showed "cord compression" when in fact it showed "no cord compression"; (3) it incorrectly asserts that Dr. Broadway concluded Plaintiff needed surgery "as soon as possible to avoid permanent damage to his arm and hand"; and (4) it misstates the date of the surgery.

R. Doc. 189, at 7–8. In response, Mancini argued that these errors raise factual issues for the jury to resolve.

-6-

The magistrate judge determined that Dr. Wyard's affidavit contained "factual errors," which were "part of a larger problem": "Dr. Wyard's affidavit fail[ed] to indicate the methodology he used to reach his conclusions and le[ft] wholly unanswered the question of *how* [d]efendant's actions caused [p]laintiff's injuries." *Id.* at 9. The magistrate judge concluded that "the expert opinion [was] too speculative and unsupported to be admissible under Rule 702 and *Daubert*"[2] in the absence of "some indication which facts were important and why." *Id.* According to the magistrate judge, Dr. Wyard failed to set forth in his affidavit "any reasoning for his conclusions as to causation." *Id.* at 10. Nowhere in the affidavit did he "describe the standard of care, explain how [d]efendant deviated from that standard of care, or identify why that deviation led to Mancini's injury." *Id.* Additionally, Dr. Wyard did not identify the methods that he used to reach his opinion. The magistrate judge found this error was "compounded by the factual errors in his affidavit, because without some methodology linking the facts with conclusions, 'there is simply too great an analytical gap between the data and the opinion proffered.'" *Id.* (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). As a result, the magistrate judge determined that Dr. Wyard's affidavit did not satisfy "*Daubert*'s reliability requirement." *Id.* The magistrate judge recommended that the district court exclude the affidavit as "speculative, unsupported by sufficient facts, [and] contrary to the facts of the case." *Id.* (alteration in original) (quoting *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006)).

The magistrate judge next concluded that Dr. Wyard's affidavit failed to satisfy the requirements of Minn. Stat. § 145.682 because it did not include "any details regarding the applicable standard of care and fail[ed] to outline a chain of causation between [d]efendant's actions and Mancini's injury." *Id.* at 12. First, Dr. Wyard opined that "delays in receiving an MRI and surgery constituted 'deviations from the standard of care,' but he [did] not say what actions would have satisfied that standard

_____

[2]*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

-7-

of care." *Id.* Second, he opined that "the delays 'resulted in [p]laintiff's symptoms worsening significantly' before his surgery, but he [did] not connect those worsened symptoms with a poor post-surgical outcome." *Id.* These "broad, generalized statements regarding the standard of care . . . fail[ed] to illustrate how and why [d]efendant's alleged malpractice caused the injury." *Id.* (internal quotation marks omitted).

Based on the magistrate judge's recommendation that the district court exclude Dr. Wyard's affidavit "under Rule 702 and *Daubert*," and because "an expert affidavit is an essential element of a medical malpractice case in Minnesota," the magistrate judge recommended that the district court grant the government's summary-judgment motion. *Id.* at 13. Alternatively, the magistrate judge recommended that even if the district court did not exclude the expert testimony, it should still dismiss the case because of Mancini's failure to comply with Minn. Stat. § 145.682.

Mancini objected to the magistrate judge's report and recommendation. The district court judgment ultimately agreed with the magistrate judge. The court first addressed the magistrate judge's finding that Dr. Wyard's opinion failed to satisfy Minn. Stat. § 145.682 because the finding "could be outcome-determinative." R. Doc. 195, at 5. The district court concluded that Dr. Wyard's affidavit failed to satisfy the level of specificity required by Minnesota law. Despite referencing "'the appropriate amount of time,' 'the proper standard of care,' 'the preoperative standard of care,' and, generally, 'the standard of care,'" Dr. Wyard failed to define the standard of care that he referenced. *Id.* at 6 (citations omitted). In addition to not defining the standard of care, the district court concluded that Dr. Wyard failed to give "any causal connection between the breach of the standard of care and Mr. Mancini's injuries." *Id.* Dr. Wyard did not explain how he would use the facts about Mancini's care, including his symptoms and an overview of the treatment timeline, to "arrive at opinions of malpractice and causation." *Id.* (quoting *Sorenson v. St. Paul Ramsey*

*Med. Ctr.*, 457 N.W.2d 188, 192 (Minn. 1990)). Because Mancini's proffered expert affidavit failed to satisfy the statutory requirements, the district court concluded that it must dismiss Mancini's medical malpractice claim pursuant to Minn. Stat. § 145.682, subdiv. 6(b).

The district court alternatively concluded that even if Dr. Wyard's opinions satisfied Minnesota law, they would not be admissible under Rule 702 and *Daubert*. First, the district court determined that Dr. Wyard's affidavit contained factual errors and contradictions to the record. *Id.* at 10 (comparing R. Doc. 177-4, at ¶ 9 ("Plaintiff's MRI showed . . . spinal cord compression") with R. Doc. No. 178-9 (MRI imaging result with "[n]o cord compression or abnormal cord signal")); *id.* (citing R. Doc. 177-4, at ¶¶ 13–14 (twice listing Mr. Mancini's surgery date as November 30, 2018, when in fact the surgery was performed on November 27, 2017)). Second, the district court concluded that Dr. Wyard failed to "identify the 'principles or methods'—or the application of those principles and methods—he used to evaluate Mr. Mancini's condition." *Id.* Dr. Wyard stated only that the defendant breached a duty of care and that the breach caused injuries; he did not identify the standard of care or describe how or why delays in treatment caused Mancini's present injuries. The district court agreed with the magistrate judge that Dr. Wyard's expert opinion was not admissible under Rule 702 and *Daubert*. It granted the government's motion to exclude Dr. Wyard's expert opinion.

Mancini asked the district court to consider an "alternate curing option" of ordering the government to depose Dr. Wyard as opposed to dismissing the case. *Id.* at 12. The court rejected Mancini's request, concluding that "Dr. Wyard's affidavit fails to identify the applicable standard of care, and fails to causally connect [d]efendant's alleged breach of the standard to Mr. Mancini's injuries. This is not one of the borderline cases where an alternative to dismissal should be employed." *Id.* at 12–13 (internal quotation marks omitted).

## II. *Discussion*

On appeal, Mancini argues that the district court erred in granting summary judgment to the government on his FTCA claim because it: (1) misapplied Minn. Stat. § 145.682 and Rule 702; (2) favored the government in its factual inferences; and (3) should have employed a less drastic curative option of ordering the defense to depose Dr. Wyard. "We review a grant of summary judgment de novo." *Becker v. City of Hillsboro*, 125 F.4th 844, 851 (8th Cir. 2025).

### A. *Minn. Stat. § 145.682*

Mancini first challenges the district court's dismissal of his FTCA claim for failure to comply with the requirements of Minn. Stat. § 145.682. He maintains that the district court "impos[ed] standards for the affidavit far beyond what is mandated by Minnesota courts" under § 145.682. Appellant's Br. at 10. He argues that application of these erroneous standards "resulted in the drastic and incorrect exclusion of Mancini's expert and, ultimately, the dismissal of his case." *Id.* "We review the district court's interpretation of state law, including § 145.682, *de novo*." *Stowell v. Huddleston*, 643 F.3d 631, 633 (8th Cir. 2011).

"Generally, sovereign immunity prevents the United States from being sued without its consent." *Iverson v. United States*, 973 F.3d 843, 846 (8th Cir. 2020) (cleaned up). "Congress waived the United States' sovereign immunity for claims arising out of torts committed by federal employees." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 217–18 (2008). "The applicable tort law is 'the law of the place where the act or omission occurred.'" *Wright v. United States*, 892 F.3d 963, 966 (8th Cir. 2018) (quoting 28 U.S.C. § 1346(b)(1)). Here, the alleged medical malpractice occurred in Minnesota.

"Medical malpractice is a common-law tort that has long been recognized in Minnesota. It is a species of common-law negligence." *Rygwall, as Tr. For Rygwall v. ACR Homes, Inc.*, 6 N.W.3d 416, 429 (Minn. 2024) (citation omitted). The

-10-

elements of a negligence claim are "duty (standard of care), breach (violation), causation, and injury." *Id.* at 431. To support a claim of medical malpractice, Minnesota law provides that an affidavit must list "each person whom plaintiff expects to call as an expert witness at trial to testify with respect to the issues of malpractice or causation, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion." Minn. Stat. § 145.682, subdiv. 4.[3] There are "three basic disclosure requirements: the identity of the expert, the substance of the facts and opinion about which the expert will testify, and a summary of the grounds for each opinion." *Sorenson*, 457 N.W.2d at 190–91 (citing Minn. Stat. § 145.682, subdiv. 4).[4] To satisfy § 145.682, the Minnesota Supreme Court requires an expert affidavit in a medical malpractice case to "include information about the hornbook elements of negligence"; specifically, the affidavit has to

---

[3]Section 145.682 "requires a plaintiff in a medical malpractice case to serve at least *two* affidavits on the defendant: one affidavit of expert review that must be served along with the summons and complaint, and one affidavit of expert identification that must be served within 180 days after commencement of discovery." *Rygwall*, 6 N.W.3d at 428 (first citing Minn. Stat. § 145.682, subdivs. 2(1), 3, then citing Minn. Stat. § 145.682, subdivs. 2(2), 4). Here, the government only challenges the second affidavit required by § 145.682; as a result, we will address only the criteria necessary to satisfy that affidavit.

[4]Section 145.682, subdiv. 4(a), provides, in relevant part that

[t]he affidavit required by subdivision 2, clause (2), must be signed by each expert listed in the affidavit and by the plaintiff's attorney and state the identity of each person whom plaintiff expects to call as an expert witness at trial to testify with respect to the issues of malpractice or causation, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion.

(1) disclose specific details concerning the expert's expected testimony, including the applicable standard of care, (2) identify the acts or omissions that the plaintiff alleges violated the standard of care, and (3) include an outline of the chain of causation between the violation of the standard of care and the plaintiff's damages.

*Rygwall*, 6 N.W.3d at 431 (quoting *Teffeteller v. Univ. of Minn.*, 645 N.W.2d 420, 428 (Minn. 2002)); *see also id.* at 434 ("[T]he affidavit must 'set[] forth the standard of care, the act or omissions violating that standard, and the chain of causation.'" (second alteration in original) (quoting *Teffeteller*, 645 N.W.2d at 430)).

"[A] medical malpractice claim is simply a claim against health care providers for failing to exercise that standard of care required of them in care and treatment." *Id.* at 429 (internal quotation marks omitted). In a medical malpractice action, the "health care professionals are judged against the care with which a reasonable health care professional would act." *Id.*

To satisfy the causation element of a medical malpractice claim, the "plaintiff must show that it is more likely than not that the defendant's conduct was a substantial factor in bringing about the result." *Id.* (internal quotation marks omitted). The plaintiff must prove that "the harm would not have occurred without the negligent act." *Id.* "[T]he classic test for determining factual cause is to compare what actually happened with a hypothetical situation identical to what actually happened but without the negligent act." *Id.* (internal quotation marks omitted).

"[A] finding of causation cannot be based upon mere speculation or conjecture." *Id.* at 430. "If a layperson could not reasonably understand and make inferences concerning the connection between the breach of duty and injury, then a plaintiff must support [his] claim of causation with expert testimony." *Id.* at 435. As a result,

[t]o show causation in circumstances where expert testimony is necessary, the expert affidavit must include an opinion with proper foundation and enough information about the specific case to reassure the court that the jury will have sufficient information to draw a reasonable inference—without speculating—that the provider's conduct caused the plaintiff's injury.

*Id.* In other words, "a plaintiff in a medical malpractice case must submit an expert affidavit that outlines a chain of causation." *Id.* at 434 (internal quotation marks omitted). An expert affidavit satisfies this requirement by "includ[ing] an opinion on causation that is supported with reference to specific facts in the record connecting the conduct of the defendant provider to the injury suffered by the harmed patient." *Id.*; *see also id.* at 432 ("[T]he affidavit must include at least '*something* about the substance of the facts and opinions regarding the alleged negligence and a summary of the grounds for each opinion.'" (quoting *Sorenson*, 457 N.W.2d at 190)). "As long as the jury can reasonably infer from the evidence, without speculation, that the defendant caused the plaintiff's injury . . . , summary judgment is not appropriate." *Id.* at 430.[5]

We agree with the district court that Dr. Wyard's affidavit fails to satisfy the requirements of Minn. Stat. § 145.682. First, although Dr. Wyard's affidavit references "the applicable standard of care," "the appropriate amount of time," "the proper standard of care," "the preoperative standard of care," and "the standard of care," R. Doc. 177-4, at 1–3, it does not "disclose specific details concerning . . . the applicable standard of care," *Teffeteller*, 645 N.W.2d at 428. In other words, Dr.

---

[5]"In this case, it is obvious that expert testimony is required, and [Mancini] made no claim to the contrary." *Sorenson*, 457 N.W.2d at 191.

Wyard never describes the applicable standard of care nor specifies the time limits for provision of the prescribed treatment for Mancini.[6]

Second, Dr. Wyard's affidavit fails to outline the chain of causation between the government's actions and Mancini's injury. Dr. Wyard gives two examples of delays in rendering medical care to Mancini: (1) Mancini's receipt of an MRI seven days later than the date ordered by Dr. Mayer, and (2) the approximately one-month delay in Mancini's surgery because of staff's failure to place him in the SHU. But a delay in care alone is insufficient to establish causation. *See Leubner v. Sterner*, 493 N.W.2d 119, 122 (Minn. 1992) ("[I]f delay in diagnosis is enough in itself, expert testimony on causation would not be necessary."). Nowhere in his affidavit does Dr. Wyard cite evidence showing that Mancini's condition worsened *because of* the delay. *See* R. Doc. 177-4, at 3 ("This string of delays resulted in Plaintiff's symptoms worsening significantly between July 1, 2017 (when he first reported his injury to Health Services) and November 30, 2018 (when he finally received his surgery)."). As the district court explained, "Dr. Wyard 'fails to indicate the methodology he used to reach his conclusions and leaves wholly unanswered the question of *how* Defendant's actions caused Plaintiff's injuries.'" R. Doc. 195, at 10 (quoting R. Doc. 189, at 9). The Minnesota Supreme Court has held similar affidavits deficient under § 145.682.[7]

---

[6]Mancini argues that Dr. Wyard did explain the standard of care: "providing necessary medical procedures on the scheduled timeline without undue delay." Appellant's Br. at 11–12. In support, he cites Dr. Wyard's statement that Mancini "was not put on NPO (nothing by mouth) status twelve hours before his surgery *contrary to health services policy.*" *Id.* at 12 (emphasis added) (quoting R. Doc.177-4, at 2). But Dr. Wyard's statement that the government failed to follow its health services policy is not an explanation of the standard of care.

[7]*See, e.g.*, *Stroud v. Hennepin Cnty. Med. Ctr.*, 556 N.W.2d 552, 554 (Minn. 1996) ("I . . . will testify that as a result of the breach of the standard of care . . . there was a failure to diagnose and treat a subarachnoid hemorrhage which ultimately

As a result, we hold that the district court did not err in concluding that Dr. Wyard's affidavit fails to satisfy § 145.682.[8]

## B. *Dismissal with Prejudice*

Mancini argues that even assuming the district court correctly determined that Dr. Wyard's affidavit was substantively deficient under § 145.682, the district court erred in dismissing the case with prejudice. He asserts that the court should have used the less drastic measure of ordering the government to depose Dr. Wyard. "Dismissal of a medical malpractice action for failure to comply with Minn. Stat. § 145.682 is reviewed for an abuse of discretion." *Pfeiffer ex rel. Pfeiffer v. Allina Health Sys.*, 851 N.W.2d 626, 633 (Minn. Ct. App. 2014).

---

resulted in a complicated hospital course and death of the Plaintiff."); *Lindberg v. Health Partners, Inc.*, 599 N.W.2d 572, 75 (Minn. 1999) ("4. Based upon a reasonable degree of medical certainty, it is more probable than not, that if, among other things, Debra Lindberg had been instructed to seek medical treatment at the time of her phone call on the morning of March 28, 1994, Lukas Stewart Lindberg would not have died. 5. Based upon a reasonable degree of medical certainty, Lukas Stewart Lindberg died as a result of the negligent and careless conduct of the Defendants and/or their agents and employees, including midwife Sharon Nichols and Donne Mathiowitz."); *Anderson v. Rengachary*, 608 N.W.2d 843, 848 (Minn. 2000) ("[T]here was a deviation from the standard of care provided to this patient which caused the patient to have postoperative dysphasia [sic] of undetermined etiology." (alteration in original)); *Teffeteller*, 645 N.W.2d at 425 ("[I]t is Dr. Perloff's opinion that had Thad Roddy's clinical status [been] appreciated as Morphine toxicity at about 8:30 a.m., and had appropriate treatment measures been utilized, i.e. frequent boluses or a continuous infusion of naloxone continuously monitored by a physician, Thad Roddy, to a reasonable degree of medical probability would have been revived successfully. Finally, it is Dr. Perloff's opinion that the departures from accepted levels of care, as above identified, were a direct cause of Thad Roddy's death." (alteration in original)).

[8]Based on our holding, we need not address the district court's alternative reasoning that Dr. Wyard's affidavit was inadmissible under Rule 702.

Section 145.682, subdiv. 6(c) provides:

> Failure to comply with subdivision 4 because of deficiencies in the affidavit . . . results, upon motion, in *mandatory dismissal with prejudice* of each action as to which expert testimony is necessary to establish a prima facie case, provided that:
>
> (1) the motion to dismiss the action identifies the claimed deficiencies in the affidavit . . . ;
>
> (2) the time for hearing the motion is at least 45 days from the date of service of the motion; and
>
> (3) before the hearing on the motion, the plaintiff does not serve upon the defendant an amended affidavit . . . that correct the claimed deficiencies.

(Emphasis added.)

Our review of the record reveals that all prerequisites for dismissal of the action under § 145.682, subdiv. 6(c), were satisfied in this case. The government moved for summary judgment on July 24, 2023. R. Doc. 175. In that motion, it identified the claimed deficiencies in Dr. Wyard's affidavit. The hearing on the motion occurred 45 days later on September 7, 2023. R. Doc. 187. Prior to the hearing, Mancini did not serve upon the government an amended affidavit to correct the claimed deficiencies. Thus, he failed to take advantage of the statute's "safe-harbor provision," which contains the "requirement that the plaintiff be given 45 days to cure the claimed deficiencies before dismissal is mandatory." *Murillo v. Heegaard*,

-16-

No. A13-1209, 2014 WL 274102, at *4 (Minn. Ct. App. Jan. 27, 2014) (quoting *Wesley v. Flor*, 806 N.W.2d 36, 40 (Minn. 2011)).[9]

Nonetheless, Mancini relies on *Sorenson* to argue that the district court should have ordered a less drastic alternative. "In *Sorenson*, [the Minnesota Supreme Court] stated in dicta that 'borderline cases' may require a remedy less drastic than dismissal with prejudice." *Anderson*, 608 N.W.2d at 848; *see also Sorenson*, 457 N.W.2d at 193 ("In borderline cases where counsel for a plaintiff identifies the experts who will testify and give some meaningful disclosure of what the testimony will be, there may be less drastic alternatives to a procedural dismissal.").

*Sorenson*'s "meaningful disclosure" standard is inapplicable here. First, *Sorenson* was decided prior to the addition of § 145.682's safe-harbor provision. *See* Act of May 22, 2022, ch. 403, § 1, 2002 Minn. Laws 1706, 1706–07 (codified as amended at Minn. Stat. § 145.682, subdiv. 6(c) (2014)). Second, as *Anderson* recognizes, its statement about "a remedy less drastic than dismissal with prejudice" is dicta. 608 N.W.2d at 848. Finally, even applying *Sorenson*, "this appeal hardly exemplifies a borderline case because [Dr. Wyard's] affidavit has serious deficiencies and does not provide any meaningful disclosure regarding how the standard of care was violated or what that standard required." *Id.* at 849.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____

_____

[9]"This safe-harbor provision was added to correct a perception that 'meritorious medical malpractice claims were being dismissed where the expert disclosure affidavit was only missing some technical information that could be corrected.'" *Pfeiffer*, 851 N.W.2d at 634 (quoting *Wesley*, 806 N.W.2d at 40).